**Arsenault v. Metropolitan Life**          03-133-PB     10/01/04

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


JoAnne Arsenault

    v.                                                Civil No. 03-133-PB
                                                        Opinion No. 2004 DNH 143
Metropolitan Life Insurance Company
and Westinghouse Electric Company


<u>**MEMORANDUM AND ORDER**</u>

JoAnne Arsenault ("Arsenault") brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(b), to recover benefits allegedly due to her under the terms of the Westinghouse Electric Company Welfare Benefits Plan (the "Plan"), which is administered by defendant Metropolitan Life Insurance Company ("MetLife"). Arsenault alleges that MetLife's decision to terminate her disability benefits was arbitrary and capricious. Before me are defendants' motion for summary judgment (Doc. No. 10) and plaintiff's cross-motion for summary judgment (Doc. No. 11). For the reasons set forth below, I grant defendants' motion and deny Arsenault's motion.

# I.   BACKGROUND[1]

Arsenault began working for Westinghouse Electric Company ("Westinghouse") (formerly known as ABB Combustion Engineering) as an administrative assistant in July 1990.  As a Westinghouse employee, Arsenault was eligible to participate in the company's welfare benefits Plan.

## A.   The Plan

The Plan provides, among other benefits, long-term disability coverage to eligible employees through a group insurance policy issued by MetLife.  In particular, the Plan provides for the payment of long-term disability benefits to eligible employees who are determined, by MetLife, to be "totally disabled."  Under the Plan, an employee will be considered "totally disabled" if, "due to Injury or Sickness," he or she is "continuously unable to perform each of the material duties" of his or her "regular job" and requires "the regular care and attendance of a Doctor."  (Admin. R. at 7).

After receiving benefit payments for 12 months, an employee

_____

[1]The background facts set forth herein are taken from the Administrative Record ("Admin. R.") filed with this court by the defendants as an Appendix in support of their motion for summary judgment.

will be considered "totally disabled" under the Plan only if he or she is also "completely and continuously unable to perform the duties of any gainful work or service for which [the employee is] reasonably qualified taking into consideration [the employee's] training, education, experience and past earnings."  (Admin. R. at 8).  The Plan alternatively provides that an employee will be considered "totally disabled" when, due to injury or sickness, he or she "suffers an 80% loss of earning capacity" and requires "the regular care and attendance of a doctor, unless in the opinion of a doctor, future or continued treatment would be of no benefit."  (Admin. R. at 8).

To qualify for long-term disability benefits under the Plan, an employee must submit written proof demonstrating, to the satisfaction of MetLife, that he or she is eligible for such benefits.  (Admin. R. at 12).  The Plan expressly invests the Plan administrator with "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan," and specifies that any such interpretation or determination "shall be given full force and effect, unless it can be shown that the interpretation or determination was

arbitrary and capricious." (Admin. R. at 16).

**B.** **Arsenault's Shoulder Surgeries**

In February 2001 Arsenault saw Dr. Guy M. Esposito, complaining that she had been having trouble with right shoulder pain "on and off for over a year." Arsenault also reported that the pain had "become worse in the past three months." Based on her reported symptoms and his examination, Dr. Esposito believed Arsenault had rotator cuff tendinitis and gave her a corticosteroid injection. (Admin. R. at 239).

When Dr. Esposito saw Arsenault again, in May 2001, she reported that while the corticosteroid injection had given her relief for about six weeks, the pain in her right shoulder had returned. Dr. Esposito noted that he would have her do "modified duty" and then referred Arsenault to Dr. Charles Blitzer for possible shoulder surgery. (Admin. R. at 238). Arsenault first saw Dr. Blitzer on June 7, 2001. He diagnosed her with a torn rotator cuff in her right shoulder and performed surgery to repair that tear for June 18, 2001. (Admin. R. at 57). Arsenault's last day of work at Westinghouse was June 15, 2001. (Admin. R. at 29).

In a post-surgical examination on July 13, 2001, Arsenault

reported to Dr. Blitzer that she was also having left shoulder pain. Dr. Blitzer indicated that Arsenault would need to have an MRI so he could determine the cause of her pain, but elected to wait until the healing in her right shoulder had progressed. (Admin. R. at 54). On August 10, 2001, Dr. Blitzer reported that Arsenault was "doing somewhat better" than she had been the week before. At this office visit he also discussed the results of the MRI on her left shoulder and his diagnosis of a torn rotator cuff. Dr. Blitzer explained to Arsenault that he wanted to see more progress in the healing and rehabilitation of her right shoulder before considering surgery on her left shoulder. (Admin. R. at 52). After evaluating Arsenault on September 4, 2001, Dr. Blitzer reported that her wound looked "excellent" and that she was "distinctly improved" and in "better spirits." (Admin. R. at 51).

After an initial evaluation conducted on June 22, 2001, Arsenault commenced physical therapy on her right shoulder on July 13, 2001. (Admin. R. at 62). The physical therapy records indicate that as of October 9, 2001, she had made "satisfactory progress thus far" and by that date was able to reach behind her back. The October 9, 2001 report also indicated that while

Arsenault would benefit from continued therapy to increase her strength, her rehabilitation potential was "good" to "excellent." (Admin. R. at 66).

On November 12, 2001, Dr. Blitzer surgically repaired a "small rotator cuff tear" in Arsenault's left shoulder. In a post-operative examination on November 20, 2001, he reported that she had "[v]ery good range of motion" in her right shoulder and that she was "[g]etting along reasonably well." (Admin. R. at 232). After an examination on December 7, 2001, he noted that overall Arsenault was "getting along very well" and was "more comfortable." Then, after his December 7, 2001, examination, Dr. Blitzer indicated that he wanted Arsenault both to "get into physical therapy for a small rotator cuff protocol" for her left shoulder, and to continue to strengthen her right shoulder. At this time he concluded that she had a "very distinctly limited work capacity." (Admin. R. at 233).

Arsenault began physical therapy on her left shoulder on December 15, 2001, three days after an initial evaluation. At the evaluation it was expected that within approximately ten weeks Arsenault would be able to "[r]eturn to work without restrictions." (Admin. R. at 123). This evaluation further

noted that Arsenault was having trouble sleeping and that her symptoms were aggravated by cold weather. In an office visit note dated January 18, 2002, Dr. Blitzer indicated that Arsenault's was "getting along somewhat better" and was "[d]istinctly improved albeit slowly," but still had a "very limited work capacity." Dr. Blitzer recommended Arsenault for aquatic therapy on her left shoulder because this form of therapy had worked well on her right shoulder. (Admin. R. at 235).

Approximately two weeks later, on February 4, 2002, Arsenault reported that she was "doing more" and that she had "made some gains in pool therapy." After this office visit, Dr. Blitzer noted that Arsenault was making "satisfactory progress" and "steady gains." He stated, however, that based upon his view of her job description, Arsenault continued to have a very limited work capacity. Then, after a telephone conversation with Arsenault the next day, February 5, 2002, Dr. Blitzer indicated that while he still did not believe she had a useful work capacity, he expected this assessment to change in 4-6 weeks. (Admin. R. at 236).

Dr. Blitzer next saw Arsenault on March 8, 2002, and reported that her right shoulder was "doing really well" and that

the range of motion on the right side was "excellent with minimal tenderness." He further noted that the left shoulder was "still moderately stiff," although it continued to slowly improve. Dr. Blitzer again noted that Arsenault was making progress, but felt "given her anxiety that things are going to proceed somewhat slowly." He recommended that she get a "mini" functional capacities assessment ("FCA") to evaluate her work capacity. (Admin. R. at 237).

In the Physical Residual Functional Capacity Questionnaire dated March 13, 2002, Dr. Blitzer indicated that he had surgically repaired both of Arsenault's torn rotator cuffs and that her prognosis was "good." Although he reported that Arsenault had some numbness in her hands, at no point in this questionnaire did Dr. Blitzer indicate that she suffered from carpal tunnel syndrome. (Admin. R. at 196-202).

C.  **Arsenault's Claim for Accident & Sickness Benefits**

After the surgery on her right shoulder, on June 26, 2001, Arsenault made a claim for "Accident & Sickness" benefits (also referred to as short-term disability benefits) under the Plan. In her claim Arsenault reported that she was prevented from working because she had surgery on her right shoulder on June 18,

-8-

2001. In the July 26, 2001 attending physician statement ("APS") that accompanied Arsenault's claim, Dr. Blitzer indicated that he had surgically repaired a large rotator cuff tear in her right shoulder. Rather than completing the form APS sent by MetLife which asked for specific information regarding Arsenault's physical capabilities,[2] Dr. Blitzer submitted his own form that merely stated that Arsenault was currently unable to work, and that it was "undetermined" when she would be able to return to work. (Admin. R. at 31-36). He signed Arsenault's disability certificate on August 3, 2001. (Admin. R. at 41).

As he had on July 26, 2001, on August 23 (Admin. R. at 38-40), October 11 (Admin. R. at 67-70), and December 31, 2001 (Admin. R. at 90-93), Dr. Blitzer elected not to complete the detailed APS forms sent to him by MetLife and simply repeated that, as of those dates, it remained "undetermined" when Arsenault would be able to return to work. Based on the

_____

[2]For example, the APS asked for specific information regarding the number of hours the patient could sit, stand, and walk; the patient's ability to climb, twist, bend, stoop, reach above shoulder level; the patient's ability to lift or carry weights between 0 and 100 pounds; and the patient's ability to repetitively perform fine finger movements, eye/hand movements and pushing/pulling.

information available, MetLife approved Arsenault's claim and paid her short-term disability benefits, effective June 15, 2001. Arsenault continued to receive these benefits until she was notified by letter dated December 11, 2001 that her short-term benefits would be terminated, effective December 17, 2001. (Admin. R. at 80).

D.    **Arsenault's Claim for Long-Term Disability Benefits**

MetLife's December 11, 2001 letter to Arsenault also provided her with the Long-Term Disability ("LTD") application that she and her physician(s) were to complete in order for MetLife to determine whether she qualified for long-term benefits.  In support of her claim, Arsenault was asked to submit, prior to January 15, 2002, the following documentation: an Agreement Concerning Long Term Disability Benefits, an Attending Physician Statement, an Activities of Daily Living form, Social Security Authorization, and a Training, Education and Experience Statement.  (Admin. R. at 80).

In late December 2001 or early January 2002, Arsenault completed an exhaustive Activities of Daily Living form in which she described the details of her daily routine.  (Admin. R. at 102-11).  In this report, Arsenault noted that she was unable to

-10-

sleep due to the pain in her shoulders and the resulting inability to find a comfortable resting position. In the section of the report that asked if she could return to her job if accommodations were made, Arsenault indicated that she would be able to:

> do some data entry with intermittent breaks. Could answer phone (if I had a headset it would help), Distribute mail (not boxes or tubes). Proof reading correspondences or manuals. Could assist w/ software questions, just can't play waitress. But I could work with caterers making plans for in-house lunch guests. Could do light mail postage metering. Order office supplies (but couldn't lift supplies) to unpack them (they come in large box). I could order lunches but can't set up & serve, due to the weights of soda and coffee pots & trays of sandwiches. Could do light filing in lower drawers, no overhead drawers. Could type short letters or memos, make copies & distribute as long as someone else carries the reams of paper to keep printers and copiers filled (1 ream weighs about 8lbs) and the copier takes 4 reams, (the printers & fax machines upstairs and downstairs were my responsibility). I could make the calls for service on office machines. I could mention too, that ergonomics are most important in the above. (Admin. R. at 106-07).

Although Arsenault noted that she had been in counseling for depression and anxiety, nowhere in the Activities of Daily Living did Arsenault indicate that she would be unable to return to work as a result of any *psychological* condition, nor did she state that such an impairment would impact her ability to work.

-11-

Rather, she provided only a comprehensive assessment of her *physical* capabilities at that time. Likewise, although in a February 6, 2002 mental status exam report, Dr. Brian F. Jackson, Ph.D, indicated that Arsenault was "in a depressed mood" and also described the "feelings of lowered self-esteem" and "decreased abilities to focus" that Arsenault had reported to him, he nevertheless noted that her speech was "coherent" and "logical," her affect was "appropriate to the content of the information discussed," and she did not suffer from "hallucinations, delusions, misinterpretations, preoccupations, obsessions," or "phobic ideas." Like Arsenault herself, Dr. Jackson did not note the existence of a psychological condition that would prevent her from returning to work. (Admin. R. at 161-63).

Based upon the reports from Arsenault and her treatment providers, MetLife informed Arsenault in a letter dated March 1, 2002 that her long-term benefits had been denied, effective December 17, 2001. The letter enumerated the specific evidence MetLife considered in making its benefits determination, including the February 6, 2002 report from Dr. Jackson. MetLife explained that, based on its review of this evidence, Arsenault's claim had been denied "due to lack of proof of disability

provided to MetLife to support [her] inability to perform [her] occupation at Westinghouse Electric Company as an Administrative Assistant." (Admin. R. at 170-71).

## E.    Arsenault's Appeal

In a letter from her attorney dated August 26, 2002, Arsenault appealed MetLife's denial of her claim for long-term disability benefits and requested that her benefits be reinstated. (Admin. R. at 173-75). In support of her appeal, Arsenault's counsel provided MetLife with the Social Security Administration's July 19, 2002 decision awarding her disability benefits (effective December 2001), as well as treatment records and other reports from various medical professionals, all of whom treated or evaluated her. These included reports from Dr. Richard Naimark, Dr. Blitzer, Dr. Jackson, Nurse Jaynee Fuller, Dr. Esposito, Dr. Roy A. Hepner, Marshbrook Rehabilitation, as well as an EMG report dated March 20, 2002. (Admin. R. at 176-248).

MetLife referred Arsenault's appeal to Dr. Amy Hopkins, M.D., an independent physician consultant who is board certified in internal and occupational medicine, and Dr. Mark Schroeder,

M.D., an independent physician consultant who is board certified in psychiatry. After Dr. Hopkins and Dr. Schroeder reviewed Arsenault's appeal, MetLife referred it to Steven Fresa, a vocational rehabilitation consultant, to get more information regarding the physical requirements of Arsenault's job, and to determine if she could perform this job. (Admin. R. at 329-30).

On December 10, 2002, MetLife contacted Arsenault's counsel by telephone and notified him that MetLife had agreed to reinstate Arsenault's disability benefits for the period between December 17, 2001 and March 26, 2002. This determination was made after Dr. Hopkins and Dr. Schroeder reviewed the medical evidence submitted to MetLife by Arsenault's various treatment providers. MetLife determined that a reinstatement of Arsenault's benefits was appropriate because a functional capacities evaluation conducted on March 26, 2002 ("KEY Job Placement Assessment") indicated that as of that date, she had the functional ability to hold more than a sedentary job. In the telephone call, MetLife representative Penny Gadbois also indicated that a decision as to whether benefits would be paid

after March 26, 2002 would be made within the next few weeks. (Admin. R. at 279-80).

### 1. Dr. Hopkins' Review of the Evidence

As an independent physician consulted by MetLife, Dr. Hopkins was asked to resolve three questions based on the medical evidence provided. First, she was asked if there were any tasks that Arsenault would be unable to perform in her job as an administrative assistant. Second, she was asked to determine if the functional capacity testing provided validity testing by which she could assess whether the KEY Job Placement Assessment reflected Arsenault's true functional abilities. Finally, Dr. Hopkins was asked if Dr. Blitzer's recommendations regarding Arsenault's ability to work were supported by the medical records available. (Admin. R. at 283-84).

After reviewing the available medical records, Dr. Hopkins found that there was no documentation to support Dr. Blitzer's August 20, 2002 letter (Admin. R. at 250-51, submitted to MetLife in support of her August 26, 2002 appeal). In that letter, Dr. Hopkins concluded that Dr. Blitzer recommended greater restrictions on Arsenault's lifting abilities than were justified by the record. Nor did any documentation support the conclusion

-15-

that her condition worsened after the March 26, 2002 KEY Job Placement Assessment. Dr. Hopkins further observed that Dr. Blitzer submitted no office visit notes after March 8, 2002. With respect to the March 26, 2002 KEY Job Placement Assessment, Dr. Hopkins noted that Arsenault may have been "deconditioned," and at times she demonstrated unsafe postures, but was still able to occasionally lift and carry 12 pounds with her left hand and 17 pounds with her right, and push/pull up to 33 pounds occasionally and up to 20 pounds frequently. (Admin. R. at 285-87).

Dr. Hopkins did, however, indicate that Arsenault's job description was not sufficiently detailed for her to determine what Arsenault's actual duties were. As a result, Dr. Hopkins could not ascertain if Arsenault would have been able to perform the duties of her regular job as of December 17, 2001.[3] She also found that the KEY Job Placement Assessment testing was of limited use, in part because it lacked validity testing. Finally, with respect to Dr. Blitzer's report that Arsenault felt

_____

[3]On December 30, 2002, MetLife received an accurate description of Arsenault's job from Richard Frisbey. (Admin. R. at 332).

that Attention Deficit Hyperactivity Disorder ("ADHD") would limit her ability to sit, stand, and walk, Dr. Hopkins concluded that there was no objective evidence of the diagnosis or treatment of ADHD, or any resulting limitations. Accordingly, Dr. Hopkins found that the only possible limitations relevant to the claim period were related to Arsenault's left shoulder. (Admin. R. at 285-87).

## 2. Dr. Schroeder's Review of the Evidence

Like Dr. Hopkins, Dr. Schroeder was consulted by MetLife as an independent physician, and asked to determine if the medical records supported Arsenault's claim of a severe, consistent, objective psychiatric impairment that precluded her from performing her own occupation. If so, Dr. Schroeder was asked whether the medical records indicated what restrictions or limitations, if any, would impact her ability to work. Finally, Dr. Schroeder was asked to determine if the psychiatrist's and psychologist's recommendations regarding Arsenault's ability to work were supported by the medical evidence provided. (Admin. R. at 289).

Dr. Schroeder examined the reports from Dr. Blitzer, Dr. Jackson, Dr. Naimark, and Nurse Fuller, the Activities of Daily

Living form Arsenault completed, as well as her Arsenault's job description. On December 3, 2002, he issued his Physician Consultant Review. In this report, Dr. Schroeder noted that Arsenault's Activities of Daily Living form was "detailed" and "well-organized," and in it she documented a number of physical problems, but no specific psychiatric problems related to functional impairment. Dr. Schroeder pointed out that on this form Arsenault herself stated that, with accommodations, she could return to her job. Furthermore, Arsenault's description of her living situation offered no indication that she suffered from significant psychiatric symptoms or impairments. (Admin. R. at 290-91).

With respect to Arsenault's claimed psychiatric conditions, Dr. Schroeder concluded that the record did not support a clear, consistent, objective psychiatric impairment sufficient to preclude her from performing the essential duties of her job. He found that Nurse Fuller and Dr. Jackson's records described vague and apparently self-reported symptoms. He noted, however, that Dr. Jackson's February 6, 2002 Observed Mental Status exam was essentially within normal limits. And although Dr. Jackson made reference to bipolar disorder, post-traumatic stress disorder,

-18-

and attention deficit disorder in his reports, "diagnostic information supportive of these diagnoses" was not provided in the records. (Admin. R. at 291-93).

Dr. Schroeder found Dr. Naimark's notes to be both brief and vague. His review of Dr. Naimark's records established that Arsenault demonstrated improvement shortly after her first evaluation on April 3, 2002. According to Dr. Naimark, Arsenault's thought process was "goal directed" on April 10, 2002, and her affect was "appropriate" by April 30, 2002. None of Dr. Naimark's other notes described objective and severe psychiatric symptoms or impairments. (Admin. R. at 293).

On balance, Dr. Schroeder concluded, the record did not support the listed psychiatric diagnoses. Indeed, the psychiatric symptoms in Arsenault's records appeared to be self-reported emotional distress, largely unsubstantiated by detailed objective mental status abnormalities. Furthermore, in Dr. Schroeder's view, none of Arsenault's treatment providers provided evidence of diagnostic testing that would tend to corroborate Arsenault's largely self-reported symptoms. (Admin. R. at 293-94).

3. **MetLife's Determination of Benefits After March 26,**

**2002**

On January 8, 2003 MetLife issued its final decision on Arsenault's appeal. The decision notified her that her claim for long-term disability benefits had been approved for the period between December 17, 2001 and March 26, 2002, but denied for the period after March 26, 2002, because she no longer met the definition of "totally disabled" under the Plan. In the January 8, 2003 letter, MetLife informed Arsenault that in reviewing her entire claim, it relied on the information she submitted with her August 26, 2002 appeal letter as well as the supplemental information she provided throughout the fall and winter of 2002. The letter summarized Arsenault's job description, which was classified by a Westinghouse representative as between light and sedentary. The letter also detailed MetLife's evaluation of the evidence. MetLife explained that as of December 17, 2001, the first date on which Arsenault was eligible for long-term disability benefits, she was still experiencing pain, limitation of motion, and tenderness in her left shoulder, but that she had recovered from the surgery on her right shoulder. This conclusion was based upon, and was consistent with, Dr. Blitzer's office notes from the relevant period. As a result of the

-20-

condition of Arsenault's left shoulder, MetLife found that it was reasonable to conclude that she would have been unable to perform the duties of her regular job as of December 17, 2001. (Admin. R. at 295-98).

Similarly, the results of the KEY Job Placement Assessment conducted on March 26, 2002 indicated that Arsenault was now able occasionally lift and carry up to 17 pounds with her right hand and up to 12 pounds with her left hand, and was occasionally able to push/pull 33 pounds. Steven Fresa, the Vocational Rehabilitation Specialist who reviewed Arsenault's appeal on December 30, 2002, found that this functional capacity was compatible with Arsenault's regular job duties. Based on these assessments, MetLife determined that Arsenault was eligible for long-term disability benefits from December 17, 2001 through March 26, 2002. (Admin. R. at 295-98).

Next, MetLife explained that Dr. Blitzer's March 8, 2002 office note indicated that because Arsenault complained of hand numbness and pain, he ordered an EMG/NCV, conducted on March 20, 2002, which revealed mild bilateral carpal tunnel syndrome. However, there was no indication of any additional physical exam findings, and the March 26, 2002 KEY Job Placement Assessment,

-21-

conducted *after* the EMG/NCV, demonstrated a functional ability within the requirements of Arsenault's regular job. (Admin. R. at 295-98).

MetLife also found that Dr. Blitzer's August 20, 2002 letter was inconsistent with his earlier assessments of Arsenault's functional capabilities and, moreover, was unsupported by medical evidence or the KEY Job Placement Assessment. Additionally, the restrictions Dr. Blitzer noted with respect to Arsenault's ability to sit, stand, and walk were unsupported by any medical evidence that indicated what, if any, physical condition affected these functions. As with other conditions that purportedly impacted Arsenault's ability to perform the duties of her regular job, including bipolar disorder, post-traumatic stress disorder, and attention deficit disorder, Metlife found that Dr. Jackson and Dr. Naimark failed to support their conclusions regarding her ability to work with sufficient medical evidence.[4] Rather,

---

[4]In the January 8, 2003 letter, MetLife also informed Arsenault that because Nurse Jaynee Fuller is not a physician, her assessments were considered only in the context of the medical records provided by her doctors. MetLife explained that there were no medical records indicating that Arsenault was under the regular care of a doctor for the conditions described by Nurse Fuller for the disability period in question.

according to MetLife's review of the claim and appeal, they offered only unsubstantiated judgments and conflicting reports as to Arsenault's functional capabilities. (Admin. R. at 295-98).

Metlife then informed Arsenault that it reviewed the Social Security Award letter, which provided information regarding the payment of benefits, but did not provide an assessment of Arsenault's functional abilities. MetLife further noted that each benefits program has its own criteria for reviewing and evaluating claims and medical evidence. Finally, MetLife briefly reviewed the opinions of Dr. Hopkins and Dr. Schroeder and concluded that Arsenault no longer met the definition of disability as outlined in the Plan. Having exhausted her administrative remedies, this lawsuit followed. (Admin. R. at 295-98).

## II.  <u>STANDARD OF REVIEW</u>

When the denial of benefits is challenged under ERISA § 1132(a)(1)(B), "the standard of review depends largely on whether 'the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or

to construe the terms of the plan.'" <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 15 (1st Cir. 2002)(quoting <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989)). If the plan grants discretionary authority to the administrator, an "abuse of discretion" or "arbitrary and capricious" standard of review is mandated.[5] <u>See</u> <u>id.</u>; <u>see also</u> <u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 37 (1st Cir. 1998). In reviewing a decision to terminate benefits, a court may not substitute its judgment for that of the decision-maker. <u>Terry</u>, 145 F.3d at 40 (internal quotations omitted). Nor is it necessary for the court to determine which side it believes is right. <u>See</u> <u>Brigham v. Sun Life of Canada</u>, 317 F.3d 72, 85 (1st Cir. 2003); <u>Doyle v. Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 183-84 (1st Cir. 1998). Rather, under this deferential standard of review, a reviewing court must not disturb a decision by a plan administrator if it was within the plan administrator's authority, reasoned and supported by substantial evidence in the record. <u>See</u> <u>Doyle</u>, 144 F.3d at 183-84 (internal citations and quotations omitted). Substantial

---

[5]In the First Circuit, there is no substantive difference between "arbitrary and capricious" and "abuse of discretion" review in the ERISA context. <u>Cook v. Liberty Life Assurance Co. of Boston</u>, 320 F.3d 11, 15 n.3 & 17 n.7 (1st Cir. 2003).

evidence means "evidence reasonably sufficient to support a conclusion." Id. at 184; see also Recupero v. New England Telephone and Telegraph Co., 118 F.3d 820, 830 (1st Cir. 1997) (reviewing court should not set aside a factual finding that has adequate support in the record). And the "mere existence of contradictory evidence" does not render a plan administrator's determination arbitrary and capricious. Leahy, 315 F.3d at 19; Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001). In short, MetLife's termination decision cannot stand if, in reaching it, MetLife ignored a material factor deserving significant weight, relied upon an improper factor, or seriously erred in weighing the proper factors. See I.P. Lund Trading Aps. v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998).

## III. ANALYSIS

Arsenault argues that MetLife's determination that she was not totally disabled, and that her benefits should be terminated, was arbitrary and capricious and is unsupported by any substantial evidence. Specifically, Arsenault charges that MetLife's medical experts never addressed the cumulative effects of her numerous physical and psychological conditions and never

obtained, nor asked Arsenault to provide, an accurate description of her job duties.  See Obj. to Defs.' Mot. for Summ. J. and Pl.'s Cross Mot. for Summ. J. (Doc. No. 11) at 17-20.  Arsenault further charges that MetLife rested its benefits determination on sources of information that were of limited probative value and, moreover, gave no weight to the opinions of the various medical professionals who treated her and corroborated her claim that she was totally disabled.  See id.

MetLife responds that its benefits eligibility determination was reasonable in light of the information available.  MetLife further argues that it reasonably accepted the opinions of the medical and vocational consultants who reviewed the record and concluded that Arsenault was capable of performing her job as an administrative assistant at Westinghouse as of March 26, 2002. See Defs.' Mot. for Summ. J. (Doc. No. 10) at 20.

At the root of Arsenault's argument is her assertion that in the two letters denying her claim for long-term disability benefits, dated March 1, 2002 and January 8, 2003, MetLife failed to reference any opinion that she was capable of working and merely stated that the evidence submitted by Arsenault and her treatment providers was insufficient or unsupported.  The

gravamen of Arsenault's complaint appears to be her contention that MetLife had a "duty to obtain its own affirmative evidence" that she was capable of working, and failed to do this. Moreover, Arsenault charges that MetLife failed to address the cumulative effect of her physical and psychological conditions. See Obj. to Defs.' Mot. for Summ. J. and Pl.'s Cross Mot. for Summ. J. (Doc. No. 11) at 17. Furthermore, Arsenault faults MetLife both for failing to consider the fact that she had been awarded Social Security disability benefits and for relying on the opinions of Dr. Hopkins and Dr. Schroeder, neither of whom examined her.[6] See Obj. to Defs.' Mot. for Summ. J. and Pl.'s Cross Mot. for Summ. J. (Doc. No. 11) at 13.

The flaw in Arsenault's first argument is that she misconstrues the burden of a benefits determination under the

---

[6]In the "Medical Evidence" section of her objection and cross-motion for summary judgment, Arsenault included two reports from Dr. Michael Haenick, dated September 12, 2003 and November 17, 2003. These reports were produced long after the administrative proceedings concerning her claim for benefits had concluded and were not part of the administrative record. These reports will therefore not be considered by this Court. See Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 19 (1st Cir. 2003) (quoting Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997)(observing that "the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed")).

-27-

Plan. The Plan administrator is not required to conduct an independent investigation to determine whether or not an employee is capable of performing the material duties of his or her job. See Brigham, 317 F.3d at 84-85. Rather, the burden rests with the employee to provide proof, satisfactory to MetLife, that he or she is totally disabled and thus entitled to long-term benefits under the Plan. Again, the language of the Plan is instructive. The Plan unambiguously requires that the proof furnished by an employee in support of his or her claim "must be satisfactory to [MetLife]." Accordingly, to demonstrate her entitlement to benefits under the Plan, Arsenault was required to furnish proof sufficient to substantiate her physicians' claim that she was unable to work. See Brigham, 317 F.3d at 84-85. Here, the evidence in the record is capable of supporting competing inferences as to Arsenault's ability to return to work after March 26, 2002. When, as here, the medical evidence is conflicted, the Plan administrator's decision to terminate benefits is not unreasonable and should therefore be accorded deference. See Leahy, 315 F.3d at 19-20.

Arsenault's second argument, that MetLife failed to address the cumulative effect of her physical and psychological

conditions, suffers from the same flawed reasoning. It is, therefore, equally unavailing. As MetLife explained in rejecting Arsenault's appeal, reports and records from Dr. Jackson and Dr. Naimark failed to provide diagnostic information supportive of the medical conditions diagnosed, and the medical evidence failed to support the existence of a psychological condition that affected Arsenault's ability to perform the duties of her regular job. There are undoubtedly cases in which laboratory tests or other diagnostic procedures will not be necessary to substantiate a claim of disability, particularly when the disabling condition underlying the claim is not susceptible to such objective evaluations. See Cook, 320 F.3d at 21-22 (noting that given the nature of plaintiff's disease, it was not reasonable for insurer to expect her to provide clinical objective evidence of her condition); Brigham v. Sun Life of Canada, 317 F.3d 72, 84 (1st Cir. 2003). In Arsenault's case, however, neither Dr. Jackson nor Dr. Naimark provided any explanation for their conclusion that Arsenault suffered from bipolar disorder, post-traumatic stress disorder, or attention deficit disorder, and that these conditions prevented her from returning to work.

Moreover, the medical opinions offered by Dr. Jackson and

-29-

Dr. Naimark were by no means conclusive. For example, despite reporting that Arsenault experienced feelings of depression, anxiety and emotional distress, Dr. Jackson's February 6, 2002 mental status exam concluded that Arsenault was essentially normal. Similarly, Dr. Naimark's October 8, 2002 letter indicating that Arsenault was unable to work due to her symptoms ran counter to his April 2002 office notes that reported significant improvement including "good eye contact" and a "goal directed thought process." In light of this contradictory evidence, it was not unreasonable for MetLife to find that the reported psychological conditions did not have a cumulative effect on Arsenault's physical ability to return to work. See Leahy, 315 F.3d at 19 (observing that when medical evidence is sharply conflicted, the deference due to a plan administer may be especially great).

Next, the mere fact of a disability award from the Social Security Administration is not binding on MetLife. See Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 215 (1st Cir. 2004); Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000). As MetLife explained in its January 8, 2003 letter, the criteria for determining eligibility for Social

-30-

Security benefits may be substantially different than the criteria established by the Plan here. See Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003)(noting that claimant was required to satisfy *the plan's* definition of total disability rather than the Social Security Administration's definition); Pari-Fasano, 230 F.3d at 420. And although a related Social Security benefits decision might be of some value to a plan administrator's eligibility determination, particularly in cases in which the Social Security Administration makes specific findings, the Social Security letter in Arsenault's case only provided information regarding the payment of her benefits and no information describing how the Administration reached its eligibility determination. See Gannon, 360 F.3d at 215. MetLife's decision not to credit this eligibility determination was therefore not unreasonable.

Lastly, MetLife, as the Plan administrator, was authorized to weigh conflicting evidence and to determine the weight accorded to the opinions of Arsenault's physicians. See Vlass, 244 F.3d at 32. The Supreme Court has held that courts may not require plan administrators to accord special deference to the opinions of an employee's treating physicians. See Black &

Decker Disability Plan v. Nord, 528 U.S. 822, 834 (2003).

Accordingly, MetLife was permitted to rely upon the opinions of Dr. Hopkins and Dr. Schroeder, even though they did not examine Arsenault, and even though they based their opinions solely on a review of the file. See Gannon, 360 F.3d at 214-15; Matias-Correa v. Pfizer, 345 F.3d 7, 12 (1st Cir. 2003). It was also reasonable for MetLife to rely, as Dr. Schroeder did in his December 3, 2002 physician consultant review, on the information Arsenault provided in her Activities of Daily Living form, in which she acknowledged that, with physical accommodations, she could return to her job as an administrative assistant at Westinghouse. Arsenault's own view of her functional abilities was consistent with, and buttressed by, Dr. Blitzer's evaluations through March 2002. In fact, it was not until August 20, 2002 that Dr. Blitzer recommended greater restrictions for Arsenault, and, as Dr. Hopkins noted, these restrictions were unsubstantiated by either the KEY Job Placement Assessment or any medical evidence indicating that Arsenault's condition had taken a turn for the worse. Given MetLife's right to use its discretion under the Plan, it was for MetLife alone to determine precisely how to measure the strength of contradictory opinions.

-32-

## IV.  **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 10) is granted and Arsenault's cross-motion for summary judgment (Doc. No. 11) is denied.

SO ORDERED.

_____
Paul J. Barbadoro
Chief Judge

October 1, 2004

cc:  Bradley M. Lown, Esq.
     William D. Pandolph, Esq.